1 | LIONEL Z. GLANCY #134180
PETER A. BINKOW #173848

2 | MICHAEL GOLDBERG #188669
GLANCY BINKOW & GOLDBERG LLP

3 | 1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067

4 | Telephone: (310) 201-9150
Facsimile: (310) 201-9160

5

6 | *Local Counsel*

7 | JONATHAN GARDNER
BRIAN PENNY

8 | LABATON SUCHAROW LLP
140 Broadway

9 | New York, New York 10005
Telephone: (212) 907-0700

10 | Facsimile: (212) 818-0477
Email: info@labaton.com

11 | *Attorneys for Lead Plaintiff Kwok Wong
and Lead Counsel for the Class*

ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

FEB 1 6 2010
12.01 pm

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

12

13 | **UNITED STATES DISTRICT COURT**

14 | **CENTRAL DISTRICT OF CALIFORNIA**

15 | Ramsey et al. v. MRV Communications,
Inc. et. al.

)
) Civil Action No. CV 08-04561 GAF
) (RCx)
)
) **SECOND AMENDED**
) **CONSOLIDATED CLASS**
) **ACTION COMPLAINT FOR**
) **VIOLATION OF THE FEDERAL**
) **SECURITIES LAWS**
)
) **JURY TRIAL DEMANDED**

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT

1

## TABLE OF CONTENTS

2  INTRODUCTION ..................................................................................................... 1

3  JURISDICTION AND VENUE ............................................................................... 4

4  CLASS ACTION ALLEGATIONS ........................................................................ 4

5  THE PARTIES .......................................................................................................... 6

6  FRAUDULENT SCHEME AND COURSE OF BUSINESS ................................ 10

7  BACKGROUND ...................................................................................................... 11

8       The Stock Options Backdating Scandal ............................................................ 14

9       Statistical Evidence of Backdating .................................................................... 21

10       MRV's Stock Option Plans ................................................................................ 28

11       Role of the Compensation Committee ............................................................... 29

12  DEFENDANTS' MATERIALLY FALSE AND MISLEADING
   STATEMENTS ISSUED DURING THE CLASS PERIOD ................................... 30

13       The 2002 Form 10-K .......................................................................................... 30

14       The March 31, 2003 Form 10-Q ........................................................................ 40

15       The July 24, 2003 Earnings Release .................................................................. 41

16       The August 13, 2003 Form 10-Q ....................................................................... 43

17       The October 22, 2003 Earnings Release ............................................................ 44

18       The 2002 Proxy Statement ................................................................................. 45

19       The November 14, 2003 Form 10-Q .................................................................. 45

20       The February 5, 2004 Earnings Release ............................................................ 46

21       The 2003 Form 10-K .......................................................................................... 48

22       The April 22, 2004 Earnings Release ................................................................ 49

23       The April 30, 2004 Form 10-Q .......................................................................... 49

24       The July 22, 2004 Earnings Release .................................................................. 50

25       The July 30, 2004 Form 10-Q ............................................................................ 51

26       The October 21, 2004 Earnings Release ............................................................ 51

27       The October 28, 2004 Form 10-Q ...................................................................... 52

28       The 2003 Proxy Statement ................................................................................. 52

SECOND AMENDED CLASS ACTION COMPLAINT

The February 10, 2005 Earnings Release ....................................................... 53

The 2004 Form 10-K ................................................................................... 54

The April 27, 2005 Earnings Release .......................................................... 58

The May 10, 2005 Form 10-Q ..................................................................... 59

The July 27, 2005 Earnings Release ............................................................ 59

The July 29, 2005 Form 10-Q ...................................................................... 60

The 2004 Proxy Statement ........................................................................... 61

The October 27, 2005 Earnings Release ...................................................... 61

The October 31, 2005 Form 10-Q ................................................................ 63

The February 15, 2006 Earnings Release ..................................................... 63

The 2005 Form 10-K ................................................................................... 65

The 2005 Proxy Statement ........................................................................... 66

The April 26, 2006 Earnings Release .......................................................... 67

The May 2, 2006 Form 10-Q ....................................................................... 69

The July 26, 2006 Earnings Release ............................................................ 71

The August 2, 2006 Form 10-Q ................................................................... 74

The October 25, 2006 Earnings Release ...................................................... 75

The November 3, 2006 Form 10-Q .............................................................. 78

The February 15, 2007 Earnings Release ..................................................... 78

The 2006 Form 10-K ................................................................................... 82

The April 25, 2007 Earnings Release .......................................................... 87

The 2006 Proxy Statement ........................................................................... 89

The May 7, 2007 Form 10-Q ....................................................................... 95

MRV's Undisclosed Internal Review Of Its Stock Option Practices ........... 96

The July 6, 2007 and July 20, 2007 Press Releases ..................................... 96

The July 25, 2007 Earnings Release ............................................................ 96

The August 2, 2007 Form 10-Q ................................................................... 98

The November 8, 2007 Earnings Release ..................................................... 99

The November 9, 2007 Form 10-Q................................................101

The February 28, 2008 Earnings Release ....................................102

The 2007 Form 10-K........................................................................104

The 2007 Form 10-K/A....................................................................105

The April 30, 2008 Earnings Release ..........................................105

The May 12, 2008 Form 10-Q ........................................................106

THE TRUTH EMERGES ..........................................................................108

LOSS CAUSATION & ECONOMIC LOSS............................................125

UNDISCLOSED ADVERSE INFORMATION......................................127

ADDITIONAL SCIENTER ALLEGATIONS ........................................129

Applicability of Presumption of Reliance:
Fraud on the Market Doctrine..........................................................133

No Safe Harbor..................................................................................134

COUNT I
For Violation Of Section 10(b) Of The 1934 Act And Rule 10b-5 Against All
Defendants ..........................................................................................135

COUNT II
For Violation Of § 20(a) Of The 1934 Act Against the Individual Defendants ...138

COUNT III
For Violation Of § 14(a) Of The 1934 Act Against All Defendants ....................139

PRAYER FOR RELIEF ............................................................................140

JURY DEMAND........................................................................................141

Lead Plaintiff Kwok Wong, individually and on behalf of all other persons and entities similarly situated, by his undersigned attorneys, allege in this Second Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") the following based upon personal knowledge as to himself and his own acts and on information and belief as to all other matters based upon the investigation of Lead Plaintiff's counsel, which included, among other things: 1) a review of United States Securities and Exchange Commission ("SEC") filings by MRV Communications, Inc. ("MRV" or "Company"), as well as the Company's regulatory filings and reports; 2) a review of securities analysts' reports and advisories about the Company; 3) a review of press releases, conference calls and other public statements issued by the Company; 4) a review of media reports about the Company; 5) the retention of Professor Erik Lie, a statistician, and 6) a review of other publicly available information about the Company including the restatement filed by the Company on October 8, 2009. Lead Plaintiff believes that substantial additional evidentiary support for the allegations set forth in this Complaint will become known after a reasonable opportunity for discovery.

## **INTRODUCTION**

1.    This is a securities class action on behalf of all persons who purchased the common stock of MRV (NASDAQ: MRVC) between March 31, 2003 and June 5, 2008,[1] inclusive (the "Class Period"), against MRV and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

---

[1] Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest.

FIRST AMENDED CLASS ACTION COMPLAINT

1      2.     Stock options are a form of employee compensation.  When an option
2  vests, the holder can exercise the option by tendering the exercise price in
3  exchange for the stock underlying the option.  Options are typically granted with
4  exercise prices that equal the fair market value of the underlying stock on the date
5  they are granted (the "grant date").  When issued in this manner, options are a
6  favored form of executive compensation because they are seen by investors as a
7  way to align compensation with performance.

8      3.     Backdating options is the practice of selecting the grant date of an
9  option with the benefit of hindsight to ensure the option is granted with an exercise
10  price that is **below** the fair market value of the company's stock on the purported
11  grant date.

12      4.     For example, if a company's stock is trading at $1 on May 1st, but
13  rises to $5 by May 10th, an executive may decide on May 10th to grant options as
14  if they were issued on May 1st.  In this way, the executive grants an option with an
15  exercise price that is actually only 20% of the fair market value of the underlying
16  stock on the date of the grant, but that is not apparent to the Company's
17  shareholders because the company will not recognize the other 80% (the options'
18  intrinsic value) as a compensation expense on the Company's financial statements.
19  Thus, by backdating the option the executive was able to (1) maximize the value of
20  the option to the option's grantee, (2) ensure it has intrinsic value when issued, and
21  (3) hide that compensation expense from investors.

22      5.     Since 2006, scores of publicly traded companies have admitted they
23  backdated options, thus hiding millions of dollars worth of undisclosed
24  compensation expense.

25      6.     On June 6, 2008, Defendants joined their ranks, admitting that they
26  backdated stock options between at least 2002 and 2004, and warning the market
27  that they would need to restate their previously issued financial results between at
28  least 2002 and 2008.

FIRST AMENDED CLASS ACTION COMPLAINT          2

1      7.     Upon this disclosure, MRV's shares lost 24% of their value.

2      8.     There is little doubt Defendants intentionally backdated options for

3 more than a decade.  Aside from the Company's June 5th admission, Professor Erik

4 Lie, the world's leading statistician on the issue of option backdating, has analyzed

5 all of MRV's publicly reported historical stock option grants and found that

6 between 1995 and 2005, Defendants purportedly granted options **on one of the**

7 **five lowest trading days for MRV stock in the relevant quarter 16 of 37 times**.

8 The chance of this happening by luck (i.e., without manipulation) are an

9 astronomically slim **0.00001%**.

10     9.     On October 8, 2009, the Defendants filed a Form 10-K  for the period

11 ending December 31, 2008, which restated MRV's financial results for 1994

12 through 2008 (the "Restatement").  The Restatement erased more than $74 million

13 in compensation expenses that were not accounted for properly by the Company.

14    10.    By manipulating the grant dates of millions of options, Defendants

15 intentionally hid millions of dollars in undisclosed compensation expense from

16 MRV's shareholders for more than a decade.  Once the proper accounting was

17 applied to these options, as evidenced by the Restatement, MRV actually incurred

18 far greater net losses, operating losses and losses per share than they previously

19 stated.

20    11.    Throughout the Class Period, Defendants issued a series of repetitive

21 false and misleading statements to conceal their fraud and signed and/or certified

22 financial statements they knew to be materially misstated as a result of their

23 backdating.

24    12.    Throughout this time period, Defendants also granted **themselves**

25 hundreds of thousands of backdated stock options.

26    13.    Even though the options backdating alarms had sounded by 2006,

27 Defendants continued to falsify their accounting for such backdated options and

28 continued to issue false and misleading statements to conceal their existence until

1   June 2008. In fact, as the Restatement acknowledges, MRV admitted to
2   investigating option backdating at the Company in mid-2006 through 2007, but
3   Defendants refused even then to admit their fraud.

4       14.    Having finally admitted to backdating options, the rest of Defendants'
5   accounting fraud has unraveled around them.

6   <u>**JURISDICTION AND VENUE**</u>

7       15.    Jurisdiction is conferred by 28 U.S.C. § 1331 and § 27 of the 1934
8   Act. The claims asserted herein arise under §§ 10(b) and 20(a) of the 1934 Act [15
9   U.S.C. §§ 78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. § 240.10b-5]. The
10  amount in controversy, exclusive of interest and costs, exceeds the jurisdictional
11  minimum of this Court.

12      16.    Venue is proper here pursuant to § 27 of the 1934 Act. Many of the
13  false and misleading statements were made in or issued from this District. MRV
14  has a substantial presence in California and is headquartered in Chatsworth,
15  California. Many of the acts and transactions giving rise to the violations of law
16  complained of occurred here.

17      17.    In connection with the acts alleged in this Complaint, Defendants
18  directly or indirectly used the means and instrumentalities of interstate commerce,
19  including, but not limited to, the mails, interstate telephone communications and
20  the facilities of the national securities markets.

21  <u>**CLASS ACTION ALLEGATIONS**</u>

22      18.    Lead Plaintiff brings this action as a class action pursuant to Rule 23
23  of the Federal Rules of Civil Procedure on behalf of all persons who purchased
24  MRV common stock during the Class Period, and who were damaged thereby (the
25  "Class"). Excluded from the Class are Defendants, the officers and directors of the
26  Company, at all relevant times, members of their immediate families and their
27  legal representatives, heirs, successors or assigns and any entity in which any
28  Defendant has or had a controlling interest.

1       19.    The members of the Class are so numerous that joinder of all

2   members is impracticable. The disposition of their claims in a class action will

3   provide substantial benefits to the parties and the Court. MRV has over 157 million

4   shares of stock outstanding. Throughout the Class Period, MRV stock was actively

5   traded on the NASDAQ. While the exact number of Class members is unknown to

6   Lead Plaintiff at this time and can only be ascertained through appropriate

7   discovery, Lead Plaintiff believes that there are hundreds or thousands of members

8   in the proposed Class. Record owners and other members of the Class may be

9   identified from records maintained by MRV or its transfer agent and may be

10   notified of the pendency of this action by mail, using the form of notice similar to

11   that customarily used in securities class actions.

12       20.    There is a well-defined community of interest in the questions of law

13   and fact involved in this case. Questions of law and fact common to the members

14   of the Class which predominate over questions which may affect individual Class

15   members include:

16           (a)    whether the 1934 Act was violated by Defendants;

17           (b)    whether Defendants omitted and/or misrepresented material

18   facts;

19           (c)    whether Defendants' statements omitted material facts

20   necessary to make the statements made, in light of the circumstances under which

21   they were made, not misleading;

22           (d)    whether Defendants knew or deliberately disregarded that their

23   statements were false and misleading;

24           (e)    whether the price of MRV common stock was artificially

25   inflated; and

26           (f)    the extent of damage sustained by Class members and the

27   appropriate measure of damages.

28

1      21.    Lead Plaintiff's claims are typical of those of the Class because both

2  Lead Plaintiff and the Class sustained damages from Defendants' wrongful

3  conduct.

4      22.    Lead Plaintiff will adequately protect the interests of the Class and has

5  retained counsel who are experienced in class action securities litigation. Lead

6  Plaintiff has no interests which conflict with those of the Class.

7      23.    A class action is superior to other available methods for the fair and

8  efficient adjudication of this controversy since joinder of all members is

9  impracticable. Furthermore, as the damages suffered by individual Class members

10  may be relatively small, the expense and burden of individual litigation make it

11  impossible for members of the Class to individually redress the wrongs done to

12  them. There will be no difficulty in the management of this action as a class action.

13                         **THE PARTIES**

14      24.    Lead Plaintiff Kwok Wong ("Lead Plaintiff") purchased MRV

15  common stock during the Class Period, as described in his certification previously

16  filed with the Court, and was damaged thereby.

17      25.    Defendant MRV is a Delaware corporation with its principal

18  executive offices located at 20415 Nordhoff Street, Chatsworth, California 91311.

19  MRV is a supplier of communications equipment and services to carriers,

20  governments and enterprise customers worldwide. The Company is a supplier of

21  optical components, primarily through its wholly owned subsidiaries, Source

22  Photonics and Fiberxon. The Company conducts its business along three principal

23  segments: the network equipment group, the network integration group and the

24  optical components group. At all relevant times, MRV's stock was actively traded

25  on the NASDAQ Stock Market, under the symbol MRVC.

26      26.    Defendant Noam Lotan ("Lotan") has served as the Company's Chief

27  Executive Officer ("CEO"), President, and a director since May 1990. Defendant

28

1   Lotan was also MRV's Chief Financial Officer ("CFO") from October 1993
2   through June 1995.

3       27.    Defendant Shay Gonen ("Gonen") was the CFO of MRV from
4   September 2001 until his resignation on December 2, 2005. Gonen joined the
5   Company in 1996 and served in certain MRV subsidiaries in various capacities.

6       28.    Defendant Kevin Rubin served as MRV's CFO from December 2005
7   until his resignation on July 6, 2007.  Rubin joined MRV in April 2002 as the
8   Company's Vice President of Finance and Corporate Compliance.

9       29.    Defendant Guy Avidan has served as MRV's CFO since July 2007.
10  Avidan has been employed at MRV since 1995, and served as the Company's Vice
11  President and General Manager of MRV International from September 2001
12  through July 2007.

13      30.    Defendant Michael Blust ("Blust") served as MRV's Vice President
14  of Finance from December 2005 until his resignation on July 20, 2007. From
15  August 2002 to December 2005, Blust served as MRV's Corporate Controller.

16      31.    Defendant Guenter Jaensch ("Jaensch") has been a member of MRV's
17  Board of Directors and the Board's Compensation and Audit Committees since
18  1997.  From 1997 through 2003, Jaensch and Defendant Igal Shidlovsky were the
19  only members of MRV's Compensation Committee.  Jaensch has been declared an
20  "audit committee financial expert" for purposes of Item 401(h) of Regulation S-K
21  of the SEC.

22      32.    Defendant Igal Shidlovsky ("Shidlovsky") has been a member of
23  MRV's Board of Directors and the Board's Compensation and Audit Committees
24  since 1997.  From 1997 through 2003, Shidlovsky and Defendant Jaensch were the
25  only members of MRV's Compensation Committee.  Shidlovsky has been the
26  Chairman of the Compensation Committee since 2004.

27
28

1      33.   Defendant Daniel Tsui ("Tsui") has been a member of MRV's Board

2  of Directors since 1999.  He has been a member of the Audit Committee since

3  2001 and a member of the Compensation Committee since 2004.

4      34.   Defendant Baruch Fischer ("Fischer") has been a member of MRV's

5  Board of Directors since 1999.  He has been a member of the Compensation

6  Committee since 2004.

7      35.   Defendants Lotan, Gonen, Rubin, Avidan, Blust, Jaensch, Shidlovsky,

8  Tsui and Fischer are referred to herein as the "Individual Defendants."

9  Additionally, Defendants Lotan, Gonen, Rubin, Avidan and Blust are sometimes

10  referred to as the "Executive Defendants," and Defendants Jaensch, Shidlovsky,

11  Tsui and Fischer are sometimes referred to as the "Compensation Committee

12  Defendants."  Defendant MRV and the Individual Defendants are collectively

13  referred to as "Defendants."

14      36.   Because of the Executive Defendants' positions of responsibility and

15  control over MRV, they knew the adverse non-public information about the

16  business of MRV, as well as its stock option practices, finances, markets and

17  present and future business prospects, via access to internal corporate documents,

18  conversations and connections with other corporate officers and employees,

19  attendance at management and/or Board and committee meetings and via reports

20  and other information provided to them in connection therewith. During the Class

21  Period, the Executive Defendants participated in the issuance of false and/or

22  misleading statements, including the preparation of the false and/or misleading

23  press releases and SEC filings alleged herein.

24      37.   As members of MRV's Board of Directors and its Compensation

25  Committee, the Compensation Committee Defendants were responsible for

26  administering the Company's stock option plans and approving the grant of options

27  thereunder, including the number of options granted, the exercise price and the

28  grant date of those options.  Because of the Compensation Committee Defendants'

1   positions, they knew the adverse non-public information about the business of

2   MRV, as well as its finances, markets and present and future business prospects,

3   via access to internal corporate documents, conversations and connections with

4   other corporate officers and employees, attendance at Board meetings and via

5   reports and other information provided to them in connection therewith. During the

6   Class Period, the Compensation Committee Defendants participated in the issuance

7   of false and/or misleading statements, including the preparation of the false and/or

8   misleading press releases and SEC filings alleged herein.

9          38.   Because of their possession of such information, the Individual

10  Defendants knew or were deliberately reckless in disregarding that the adverse

11  facts specified herein had not been disclosed to, and were being concealed from,

12  the investing public.

13         39.   The Individual Defendants are liable as direct participants in the

14  wrongs complained of herein. In addition, the Individual Defendants, by reason of

15  their status as senior executive officers and/or directors, were "controlling persons"

16  within the meaning of § 20(a) of the 1934 Act and had the power and influence to

17  cause the Company to engage in the unlawful conduct complained of herein.

18  Because of their positions of control, the Individual Defendants were able to and

19  did, directly or indirectly, control the conduct of MRV's business.

20         40.   The Individual Defendants, because of their positions with the

21  Company, controlled and/or possessed the authority to control the contents of

22  MRV's reports, press releases and presentations to securities analysts, money and

23  portfolio managers and institutional investors, i.e., the market or the investing

24  public. The Individual Defendants were provided with copies of the Company's

25  reports and press releases alleged herein to be misleading prior to or shortly after

26  their issuance and had the ability and opportunity to prevent their issuance or cause

27  them to be corrected. Thus, the Individual Defendants had the opportunity to

28  commit the fraudulent acts alleged herein.

---

First Amended Class Action Complaint                                              9

41.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was, and is, 1) registered with the SEC pursuant to the 1934 Act, 2) traded on the NASDAQ and 3) governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to MRV's financial condition and performance, growth, operations, financial statements, business, products, market, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of MRV's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

42.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of MRV's publicly traded securities during the Class Period by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public about the nature of MRV's stock option practices, as well as its business, operations, management, and earnings; (ii) artificially inflated the price of MRV common stock; and (iii) caused Lead Plaintiff and members of the Class to purchase MRV common stock at artificially inflated prices.

43.     Between at least 2002 and 2008, Defendants caused MRV to file false and misleading statements with the SEC, including Proxy Statements, which stated that the options granted by MRV carried with them an exercise price that was not less than the fair market value of MRV stock on the date of grant.

44.     In fact, Defendants were aware that the practices employed by the Board allowed certain stock option grants to be backdated to dates when the

1  Company's shares were trading at or near the lowest price for the relevant period.
2  By early 2008, Defendants' backdating scheme had yielded stock option grants to
3  themselves and the Company's other executive officers worth millions of dollars—
4  all of it undisclosed compensation expense that would materially depress the
5  Company's previously issued financial results.

6      45.    Defendants' misrepresentations and wrongful course of conduct
7  violated the 1934 Act. By authorizing and/or acquiescing in the stock option
8  backdating scheme, including the intentionally improper accounting for those
9  options, Defendants caused or allowed MRV to issue false statements that failed to
10  disclose or misstated the following: (i) that the Company's internal controls were
11  plagued by material weaknesses that prevented it from issuing accurate financial
12  reports and projections; (ii) that because of improperly recorded stock-based
13  compensation expenses, the Company's financial results violated GAAP; and (iii)
14  that the Company's public disclosures throughout the Class Period presented an
15  inflated view of MRV's earnings and earnings per share, which would later have to
16  be restated.

17  **BACKGROUND**

18      46.    Courts have aptly described stock options and the backdating of stock
19  options as follows:

20      **Stock Option Granting, Dating and Pricing**

21
22      A stock option granted to an employee of a corporation
23  allows the employee to purchase at some future date a
24  specified number of shares of corporate stock at a
25  specified price, called the "exercise price." If the exercise
26  price is the same as the market price of the stock on the
27  date the option is granted [the "grant date"], the option is
28  said to be "at-the-money." Under Generally Accepted

---

FIRST AMENDED CLASS ACTION COMPLAINT

Accounting Principles ("GAAP"), a company that grants an option "at-the-money" is not required to record the grants as compensation expenses. **On the other hand, if the exercise price of the option is less than the market price of the stock on the date the option is granted, the options is said to be "in-the-money." Under GAAP [specifically APB 25], the company must record a compensation expense for the "in-the-money" option grant, equal to the difference between the exercise price and the market price of the stock on the date the option is granted.**

**Stock Option Backdating**

"Stock option backdating" is a phrase that describes a practice in which the record date of the option grant deviates from the actual grant date. A stock option is said to have been "backdated" if it was actually granted on one date, but the option itself is dated and is "recorded" on the books of the company as granted on an earlier date. Backdating a stock option is not necessarily improper. Backdating may be improper, however, if the practice misleads shareholders. For example, if the grant date of a stock option to an employee is backdated to a date when the market price was lower than the market price on the actual grant date, the option would be "in-the-money." If the company does not record and report a compensation expense as required by GAAP, any subsequently issued financial statement would be

misleading. See 6 Bromberg & Lowenfels on Securities Fraud § 17:1 (2d ed. 2007).[2]

47.     Backdated stock option grants generally fall into three categories: (i) "look back" grants, in which the date of the grant was picked retroactively (e.g., a decision in February to pick a January "grant date"); (ii) "wait and see" grants, in which a grant date was selected, but the decision was finalized - and sometimes changed - at a later date (e.g., a decision on January 1 to issue a grant on January 15, but there is a period after January 15 in which the grantor waits to see if a more advantageous price occurs and, if one does, uses that later date instead); and (iii) grants where there was a failure to complete the option grant process by the date of the grant (e.g., where there is a decision to issue a grant as of a certain date, but after that date there are changes in the grantees or amounts to grantees, and although the work is not complete on those grants as of the stated grant date, that date is nonetheless used).

48.     Under accounting rules in effect prior to 2006, public companies in the United States were permitted to grant stock options to employees without recording an expense **as long as the options' strike price was at or above the market's closing price for the stock on the day the options were granted.** However, if the option was priced below the market price on the date granted (known as an "in the money" options grant) the option granted had "intrinsic value," and GAAP required that any publicly traded company recognize and record the amount of such intrinsic value as a compensation expense in their financial statements. *See* Accounting Principles Board Opinion No. 25 ("APB No. 25"), superseded as of December 31, 2005 by FAS 123(R). Thus while "in the money"

---

[2]     *See In re Affymetrix Deriv. Litig.*, 2008 U.S. Dist. LEXIS 97245, at *5-8 (N.D. Cal. Oct. 24, 2008)(emphasis added); *In re Maxim Integrated Products, Inc. Deriv. Litig.*, 2008 U.S. Dist. LEXIS 69527, at *8-9 (N.D. Cal. Aug. 27, 2008)(emphasis added).

1   stock options are more valuable to those to whom they are granted, the additional

2   compensation expense, if reported, would reduce the total amount of operating

3   income, net income and earnings per share reported to shareholders of a publicly

4   traded company.

5       49.    The SEC has adopted the view that failure to properly account for

6   backdated options violates securities laws when companies fail to record as

7   compensation expense the amount by which the option grants were actually "in the

8   money" at the time the grant was awarded. For example, in a complaint filed by the

9   SEC against Peregrine Systems, Inc. in June 2003, the SEC alleged that

10  Peregrine's option plan administrator used a "look back" process between

11  quarterly Board meetings to identify the day with the lowest stock price over the

12  interval and then declared this date to be the grant date. The SEC viewed this as a

13  form of financial fraud because it resulted in the understatement of compensation

14  expenses. Specifically, the SEC stated, "[u]nder the applicable accounting rules,

15  any positive difference in the stock price between the exercise price and that on the

16  measurement date[3] ... had to be accounted for as compensation expense. By failing

17  to record the compensation expense, Peregrine understated its expenses by

18  approximately $90 million." This, essentially, is what Defendants have done here.

19          **The Stock Options Backdating Scandal**

20      50.    In the spring of 2006, many public corporations came under scrutiny

21  for backdating stock option grants. The scrutiny was sparked by publication of a

22  statistical paper analyzing unusually fortuitous option grants to CEO's of publicly

23  traded companys.  This paper spawned a host of articles applying the same analysis

24  showing that officers and employees of public companies received well-timed

25  option grants in frequencies that could not be explained by luck alone; statistically,

26

27  [3] Under APB 25, the "measurement date" is the date upon which the number of
    options to be granted, the identity of the grantee, and the exercise price are all
28  known.

---

1   the likelihood that the grants were timed arbitrarily was astronomical.   More than
2   200 companies have been implicated, leading to regulatory investigations, federal
3   indictments, and restatements.

4       51.    On May 6, 2006, *The Wall Street Journal* published an article by
5   Charles Forelle and James Bandler, reporting on the evolving options backdating
6   crisis:

> Backdating Probe Widens as 2 Quit Silicon Valley Firm
> — Power Integrations Officials Leave Amid Options
> Scandal; 10 Companies Involved So Far
>
> (Copyright (c) 2006, Dow Jones & Company, Inc.)
>
> The stock-options backdating scandal continued to
> intensify, with the announcement by a Silicon Valley
> chip maker that its chairman and its chief financial
> officer had abruptly resigned. That brought to eight the
> number of officials at various companies to leave their
> posts amid scrutiny of how companies grant stock
> options.
>
> Power Integrations Inc., of San Jose, Calif., said
> Chairman Howard Earhart, who is a former chief
> executive, and finance chief John Cobb had resigned. It
> also said it probably will need to restate nearly seven
> years of financial results because of options-granting
> problems.

26      52.    The article explained that acknowledgments by companies that option
27  backdating had occurred sparked internal investigations at other companies,
28  drawing the attention of the SEC, federal prosecutors and investors:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

So far, at least 10 companies have been caught up in the stock-options-dating matter, with several already in effect acknowledging that some improper dating occurred. A number of companies are conducting their own investigations or are the subjects of Securities and Exchange Commission probes. In one case, company practices have attracted the attention of federal prosecutors examining possible fraud violations.

The matter also is drawing concern from investors, who have bid down the stock prices of some of the companies caught up in the various probes. Chip maker Vitesse Semiconductor Corp. has seen shares fall about 40% since suspending three executives, while shares in giant health insurer UnitedHealth Group Inc. have fallen 18% since questions about its options-granting practices surfaced in mid-March, shaving more than $13 billion off its market capitalization.

[…]

At UnitedHealth, at least 11 executives, including CEO William McGuire and the company's general counsel, received at least one option grant dated on the lowest price of a quarter in 2000. Many executives also shared propitious option dates with Dr. McGuire through the years. The company has called its granting practices "appropriate," but its board is conducting a probe.

First Amended Class Action Complaint

16

1    UnitedHealth also has stopped giving option grants to
2    some senior executives, including Dr. McGuire.

3        53.    Suspicious patterns of sharp price inclines following the granting of
4    options, similar to those alleged herein, are "statistically unlikely" and "raise
5    questions about whether there has been backdating or other gaming of the system."
6    The article continued as follows:

7        UnitedHealth, Comverse Technology Inc. and Vitesse
8        were among six companies whose options practices were
9        examined in a March article in The Wall Street Journal.
10        *The article found that the CEOs of the companies*
11        *routinely received grants dated ahead of sharp rises in*
12        *share price, and that the likelihood of those beneficial*
13        *grant dates having occurred randomly was minute.* All
14        six companies have since said they've begun probes by
15        outside directors and lawyers into their granting
16        practices. (The Journal contacted Power Integrations for
17        the March article but didn't cite it.)

18

19                                [...]

20

21        Typically, stock options are granted by boards of
22        directors. They are generally supposed to carry exercise
23        prices equal to the fair market value of the company's
24        stock at the time of the grant. But at a number of
25        companies, grants to top executives show an unusual
26        pattern: *They're frequently dated just before [a] sharp*
27        *rise in the share price, and at or near the bottom of a*
28        *steep dip. The patterns, statistically unlikely, raise*

> *questions about whether there has been backdating or*
> *other gaming of the system.*
>
> [...]
>
> The SEC began examining options backdating more than
> a year ago. Its attention apparently was piqued by
> *academic research that found unusual patterns of stock*
> *activity around the time of options grants, suggestive of*
> *possible backdating.* The research indicates that a dating
> problem could go beyond the cluster of companies
> already under scrutiny.

(emphasis added.)

54.    The *Journal* also reported that several of the option granting investigations had led companies to announce restatements and suspend or discharge corporate executives:

> Both Power Integrations and Comverse, a New York
> maker of telecommunications software, have said their
> reviews indicate that some options grants carried dates
> that "differed" from the grants' actual dates.
>
> Both companies, whose reviews continue, said **they**
> **expect to restate financial results to record**
> **"additional noncash charges." Under accounting**
> **rules, companies need to report an expense for grants**
> **of "in the money" options** -- those that carry an exercise
> price below the market price at the time of the grant. Any
> options backdated to a day when the stock was lower
> would be in-the-money.

1    Another company, Vitesse, has suspended three

2    executives, including CEO Louis R. Tomasetta, because

3    of issues relating to "integrity of documents" in the

4    options-granting process.

5                              [...]

6

7    It's possible any executives who participated in

8    backdating could be open to civil or criminal fraud

9    charges of enriching themselves through false or

10   misleading records or filings. Lawyers cautioned that any

11   such criminal charges would require that an executive

12   who took part in backdating did so intentionally.

13                             [...]

14

15   Comverse, for one, acted swiftly. Within days of

16   beginning a probe led by outside directors, it said it

17   would probably have to restate results. Within weeks, the

18   investigation led to the resignation of Kobi Alexander,

19   who founded Comverse more than two decades ago and

20   built it into a major supplier of voice-messaging software

21   and other products. Two other executives also resigned.

22   55.    Arthur Levitt, former Chairman of the SEC, recently described this

23   backdating scheme in the bluntest possible terms: Backdating "represents the

24   ultimate in greed.... It is stealing, in effect. It is ripping off shareholders in an

25   unconscionable way." Charles Forelle and James Bandler, "Five More Companies

26   Show Questionable Options Pattern," *The Wall Street Journal*, May 22, 2006.

27

28

56.   In testimony before the U.S. Committee on Banking, Housing, and Urban Affairs on September 6, 2006, SEC Chairman Christopher Cox explained why options backdating schemes are so harmful:

> Thank you for inviting me to testify today about options backdating. This issue is one of intense public interest because it strikes at the heart of the relationship among a public company's management, its directors, and its shareholders.
>
> [...]
>
> There are many variations on the backdating theme. But here is a typical example of what some companies did: They granted an "in-the-money" option—that is, an option with an exercise price lower than that day's market price. They did this by misrepresenting the date of the option grant, to make it appear that the grant was made on an earlier date when the market value was lower. That, of course, is what is meant by abusive "backdating" in today's parlance.
>
> The purpose of disguising an in-the-money option through backdating is to allow the person who gets the option grant to realize larger potential gains—**without the company having to show it as compensation on the financial statements.**
>
> Rather obviously, this fact pattern results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws.

The SEC has been after the problem of abusive options backdating for several years.

[...]

But just as option compensation increased, so did the potential for abuse.

These [Brocade Communications Systems and Comverse Technology, Inc.] cases demonstrate some of the variations on the basic theme of fraudulent backdating that the Commission has uncovered. They involve backdated option grants that are more profitable to recipients; backdated option exercises that reduce recipients' taxes at the expense of shareholders; options granted to top executives; and options granted to rank and file employees. They involve actual personal gain to wrongdoers, and real harm to companies that failed to properly account for the options practices. . . .

(http://www.sec.gov/news/testimony/2006/ts090606cc.htm) (emphasis added).

### Statistical Evidence of Backdating

57.    Professor Erik Lie is the world's foremost statistician on the topic of backdated options.  In 2005, Professor Lie published the seminal paper entitled "On the Timing of CEO Stock Option Awards," which first uncovered the widespread backdating epidemic that had covertly infected publicly traded companies for years.  Following publication of his paper, a number of prominent reporters and analysts used his assistance and techniques to uncover a rash of backdating fraud in companies across the country.

58.     Professor Lie applied these same widely accepted statistical methods to all of MRV's publicly reported historical option grants.  He concluded the chance of Defendants selecting the reported grant dates at random were at best 0.00098%.  Specifically, MRV has reported that it granted options on 37 different grant dates between 1995 and 2005.[4]  Of these, 10 of the purported grant dates represent days on which MRV's stock closed at its lowest price in the relevant month, and 7 of those dates represented the lowest closing price for the relevant quarter.  Further analysis revealed that in all, Defendants purported to grant options on 1 of the 5 lowest monthly closing prices 25 of 37 times (the chance of which happening at random is 0.00001%), and on 1 of the 5 lowest quarterly closing prices 16 of 37 times (the chance of which happening at random is an astonishing 0.00000%).  These extremely long odds demonstrate that those in charge of granting options at MRV intentionally backdated options repeatedly for more than a decade.

59.     For example, the following charts illustrate several grants made on the lowest or near lowest price of the relevant period.

60.     On October 8, 1998, Defendants purportedly granted Shidlovsky, Jaensch and Avidan 190,000 options at a strike price of $5.25 per share.  This was the third lowest closing price for the entire year.

---

[4] This number excludes purported grants that lacked a corresponding market price match or that had odd maturities indicating either errors or a special purpose nonconforming grant.



61.    On March 26, 1999, Defendants purportedly granted an executive 30,000 options at a strike price of $5.875 per share.  This was the lowest closing price for the entire year.



62.    On December 8, 1999, Defendants purportedly granted three executives 30,000 options at a strike price of $35.25 per share.  This was the lowest closing price for the month of December.



63.    On April 9, 2003, Defendants purportedly granted Blust and another executive 5,500 options at a strike price of $1.11 per share.  This was the lowest closing price for the entire quarter.



64.    On June 30, 2003, Defendants purportedly granted Shidlovsky 60,000 options at a strike price of $1.94 per share.  This was the lowest closing price for the entire month.



65.    On March 22, 2004, Defendants purportedly granted Lotan, Gonen, Shidlovsky, Janesch, Tsui and Fischer 69,000 options at a strike price of $2.80 per share.  This was the second lowest closing price for the entire quarter.



66.    On March 24, 2004, Defendants purportedly granted Rubin and another executive 12,000 options at a strike price of $2.78 per share.  This was the lowest closing price for the entire quarter.



67.    On May 17, 2004, Defendants purportedly granted Gonen 35,000 options at a strike price of $2.18 per share.  This was the lowest closing price for the entire quarter.

68.    On August 31, 2004, Defendants purportedly granted Gonen and another executive 38,000 options at a strike price of $2.22 per share.  This was the lowest closing price for the entire quarter.



69.    On November 30, 2005, Defendants purportedly granted Rubin 15,000 options at a strike price of $1.82 per share.  This was the lowest closing price for the entire quarter.



70.    Defendants also purportedly granted options on one of the five lowest closing prices in a quarter nine more times on the following dates:  January 13,

1 | 1995, January 10, 1996, October 8, 1998, September 21, 2001, June 11, 2002,

2 | October 8, 2002, August 11, 2003, October 24, 2003, and March 22, 2004.

3 | **MRV's Stock Option Plans**

4 |     71.    During the relevant period, MRV issued stock options to its

5 | executives and employees under a number of different shareholder approved stock

6 | option plans, all with essentially the same oversight and prohibitions.  The

7 | Company's primary option plans during this time were the 1992 Stock Option Plan

8 | (the "1992 Plan"), the 1997 Incentive Stock Option Plan and Nonstatutory Stock

9 | Option Plan (the "1997 Plan"), the 1998 Nonstatutory Stock Option Plan (the

10 | "1998 Plan"), the 2000 MRV Communications, Inc. Stock Option Plan for

11 | employees of AstroTerra Corporation, the 2000 MRV Communications, Inc. Stock

12 | Option Plan for Employees of Optronics International Corp., the 2001 MRV

13 | Communications, Inc. Stock Option Plan for Employees of Appointech, Inc., the

14 | MRV Communications, Inc. 2002 Nonstatutory Stock Option Plan for Employees

15 | of Luminent, Inc., and the MRV Communications, Inc. 2002 International Stock

16 | Option Plan (collectively, the "Plans").

17 |     72.    The stated purpose of the Plans is to attract and retain the best

18 | available persons for positions of substantial responsibility at the Company, induce

19 | key employees of MRV to remain employed at the Company, encourage such key

20 | employees to acquire a greater ownership interest in the Company, and to provide

21 | additional incentives for the accomplishment of key Company objectives.

22 | According to MRV, the Plans were intended to promote continuity of management

23 | and increased incentive and personal interest in the welfare of the Company by

24 | those employees that were primarily responsible for shaping and carrying out the

25 | long-range plans of the Company and securing its continued growth and financial

26 | success.

27 |     73.    Pursuant to the Plans, they were each administered by MRV's Board

28 | of Directors, which delegated its decision making control to the Compensation

FIRST AMENDED CLASS ACTION COMPLAINT

28

1  Committee, a subcommittee of the Board.  This committee determines, inter alia,

2  the time when options will be granted, the number of options granted, and the

3  exercise price of the options.[5]

4      74.  With regard to the 1992, 1997 and 1998 Plans, "[t]he option price for

5  shares of Common Stock to be issued [under the Plan] shall be 100% of the fair

6  market value of such shares on the date on which the Option covering such shares

7  is granted by the Board (or Committee, if authorized by the Board)."

8                 **Role of the Compensation Committee**

9      75.  According to the Charter of the Compensation Committee, and as

10  reiterated in each of the Compensation Committee's reports issued to shareholders

11  annually throughout the Class Period, it is the responsibility of the committee to

12  "set and administer the policies governing the Company's compensation programs,

13  including stock option plans."

14      76.  More specifically, as of 2003, MRV's proxy statements make clear

15  that the Compensation Committee has the following responsibilities: "(a) review

16  and recommend to the Board the compensation of the Chief Executive Officer and

17  other officers of MRV, (b) oversee and advise the Board on the adoption of

18  policies that govern MRV's compensation programs, **(c) oversee MRV's**

19  **administration of its equity-based compensation and other benefit plans and**

20  **(d) recommends to the Board the grants of stock options and stock awards to**

21  **officers and employees of MRV under its stock plans."** (Emphasis added).

22      77.  The committee's reports also state that MRV's compensation policies

23  "are structured to link the compensation of the Chief Executive Officer, the Named

24  Executive Officers and other executives of the Company with corporate

25  performance" and that "through the establishment of compensation programs and

26

27

28    [5] Lead Plaintiffs investigation has not revealed who at MRV proposes or approves option grants to the Company's Compensation Committee members.

1   employment agreements, the Company has attempted to align the financial
2   interests of its executives with the results of the Company's performance, which is
3   designed to put the Company in a competitive position regarding executive
4   compensation and to ensure corporate performance, which will then enhance
5   stockholder value."

6       78.    The committee's reports note the members' belief that "its overall
7   executive compensation program has been successful in providing competitive
8   compensation appropriate to attract and retain highly qualified executives and also
9   to encourage increased performance from the executive group which should
10  increase stockholder value."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### The 2002 Form 10-K

13      79.    On or about March 28, 2003, the Company filed its annual report for
14  2002 with the SEC on Form 10-K.  The 2002 Form 10-K was also simultaneously
15  distributed to shareholders and the public.

16      80.    The 2002 Form 10-K falsely reported an annual operating loss of
17  $(146 million), an annual net loss of $(480 million) and an annual loss per share of
18  $(5.25).  Had Defendants properly accounted for backdated options they granted in
19  2002 and prior periods, the Company's operating loss, net loss and loss per share
20  would have been substantially and materially greater, making these statements
21  false and misleading.

22      81.    Additionally, when discussing MRV's stock based compensation for
23  2002 and the Company's accounting thereof, Defendants falsely stated:

24          **MRV accounts for its employee stock plan under the**
25          **intrinsic value method prescribed by Accounting**
26          **Principles Board Opinion ("APB") No. 25,**
27          "Accounting for Stock Issued to Employees," and related

interpretations, and has adopted the disclosure-only provisions of SFAS No. 123, "Accounting for Stock-Based Compensation" and as amended by SFAS No. 148, "Accounting for Stock-Based Compensation – Transition and Disclosure, an amendment of FASB Statement No. 123."

SFAS No. 123, and as amended by SFAS No. 148, permits companies to recognize, as expense over the vesting period, the fair value of all stock-based awards on the date of grant. The Black-Scholes option valuation model was developed for use in estimating the fair value of traded options, which have no vesting restrictions and are fully transferable. Because MRV's stock-based compensation plans have characteristics significantly different from those of traded options and because changes in the subjective input assumptions can materially affect the fair value estimate, management believes that the existing option valuation models do not necessarily provide a reliable single measure of the fair value of awards from the plan. **Therefore, as permitted, MRV applies the existing accounting rules under APB No. 25** and provides pro forma net loss and pro forma loss per share disclosures for stock-based awards made during the year as if the fair value method defined in SFAS No. 123, as amended, had been applied.

*       *       *

MRV accounts for option and warrant grants to non-employees using the guidance prescribed by SFAS No. 123, FASB Interpretation No. (FIN) 44, "Accounting for Certain Transactions Involving Stock Compensation (an interpretation of APB Opinion No. 25)," and Emerging Issue Task Force (EITF) No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or In Conjunction with Selling, Goods, or Services," **whereby the fair value of such option and warrant grants are measured using the fair value at the earlier of the date at which the non-employee's performance is completed or a performance commitment is reached.**

Deferred stock expense is being amortized using the graded vesting method over four years. Using this method, approximately 57%, 26%, 13% and 4%, respectively, of each option's compensation expense is amortized in each of the four years following the date of grant. Deferred stock expense generated during 2001 was $7.1 million generated through acquisitions. Deferred stock expense generated during 2000 was $160.8 million of which $106.6 million was generated through acquisitions (see Note 6, *Business Acquisitions* for additional information on MRV's material acquisitions) and $54.2 million was generated through stock options granted to Luminent's former President and its former Chief Financial Officer (see Note 15, *Stockholders'*

> *Equity*). **There was no deferred stock expense**
> **generated for the year ended December 31, 2002.**
> Total amortization of deferred stock expense for the three
> years ended December 31, 2002, 2001 and 2000 was $6.6
> million, $69.8 million and $59.9 million, respectively.

(Emphasis added).

82.     Under APB 25 MRV was required to recognize as a compensation expense the intrinsic value of all stock options that were in-the-money when actually granted.  This, MRV has admitted, it failed to do.  Thus, Defendants' statements that they accounted for options under the "intrinsic value method" proscribed by APB 25 were false and misleading.

83.     Moreover, although Defendants stated there was no deferred stock expense generated in 2002, MRV later admitted that its internal investigation had determined options were backdated in 2002.  Thus, deferred compensation expense was created in 2002, but wasn't taken.

84.     Discussing the Company's stock option plans, Defendants made the following false statements:

> MRV has various stock option and warrant plans that
> provide for granting options and warrants to purchase
> shares of MRV's common stock to employees, directors
> and non-employees performing consulting or advisory
> services for MRV. The plans provide for the granting of
> options, which meet the Internal Revenue Code
> requirements for qualification as incentive stock options,
> as well as nonstatutory options and are at the discretion
> of the board of directors. **Under these plans, stocks**
> **option and warrant exercise prices generally equal the**

**fair market value of MRV's common stock at the date of grant.** The options and warrants generally vest over three to five years with expiration dates ranging from six and ten years from the date of grant depending on the plan. The plans provide for the issuance of 16.8 million shares of common stock over the remaining life of the plans.

85.    As MRV admitted, options were backdated at least between 1995 and 2004 and Lead Plaintiff's statistical analysis confirms that hundreds of thousands of options were backdated during this period and for years before.  Therefore, Defendants' statements that options were generally granted with exercise prices that matched the fair market value of the Company's stock on the date of the grant were false and misleading.

86.    Defendants were well aware of the proper accounting for "in the money" options, as they had properly accounted for "in the money" options issued in connection with various acquisitions.  For example, regarding the acquisition of Luminent, Defendants stated:

In July 2000, Luminent and MRV entered into four-year employment contracts with the former President and former Chief Financial Officer ("CFO") of Luminent. The agreements provide for annual salaries, performance bonuses and a combination of stock options to purchase common stock of MRV and Luminent. The former President received approximately 316,000 options to purchase shares of MRV common stock at $32.56 per share (**a substantial discount**) expiring in five years. The former CFO received approximately 22,000 options to

purchase shares of MRV common stock at $33.44 per

share (**a substantial discount**) expiring in five years.

These options are immediately exercisable, however they

provide for the repurchase in the event of voluntary

termination. **These grants have been accounted for**

**under APB No. 25 and the intrinsic value (fair market**

**value less exercise price) results in additional deferred**

**stock compensation of approximately $10.8 million**

**that is being amortized over the four-year vesting**

**period.** Furthermore, Luminent granted 4.8 million and

800,000 of its stock options to the former President and

former CFO, respectively. The options are exercisable at

$6.25 per share and vest over four years. **These grants**

**have been accounted for in accordance with APB No.**

**25 and the intrinsic value (original mid point of filing**

**range, $14, less $6.25) resulted in aggregate deferred**

**stock expense of approximately $43.4 million. The**

**deferred stock expense is being amortized using the**

**graded vesting method over four years. The deferred**

**stock compensation incurred from the granting of**

**MRV and Luminent options for a total of $54.2**

**million has been included in the consolidated financial**

**statements of MRV.**

(Emphasis added).

87.    This is the very same accounting treatment that should have been

applied to MRV's backdated "in the money" stock options.  Defendants

intentionally backdated millions of options, however, specifically to hide their

1  intrinsic value and thus avoid the millions of dollars of compensation expense
2  which should have resulted from application of the accounting treatment discussed
3  above.  Defendants' proper accounting for "in the money" options issued in
4  connection with the Luminent acquisition demonstrates their knowledge of the
5  proper accounting for any "in the money" option, including backdated options.

6       88.    The 2002 Form 10-K also included the following false and misleading
7  assessment of MRV's internal controls:

>     Within the 90-day period prior to the date of this report,
>     we carried out an evaluation, under the supervision and
>     with the participation of our management, including our
>     Chief Executive Officer [Defendant Lotan] and Chief
>     Financial Officer [Defendant Gonen], of the effectiveness
>     of the design and operation of MRV's disclosure controls
>     and procedures pursuant to Rule 13a-14 of the Securities
>     Exchange Act of 1934 (the "Exchange Act"). **Based**
>     **upon that evaluation, the Chief Executive Officer and**
>     **Chief Financial Officer concluded that our disclosure**
>     **controls and procedures are effective in timely**
>     **alerting them to material information relating to**
>     **MRV (including its consolidated subsidiaries)**
>     **required to be included in MRV's Exchange Act**
>     **filings.**

(Emphasis added).

      89.    Defendants, however, knew these statements were false and
misleading, because they knew the Company lacked internal controls or procedures
to detect their backdating scheme, or to uncover the enhanced income and earnings
that the scheme produced on MRV's financial statements.

1          90.    Defendants Lotan, Gonen, Shidlovsky, Jaensch, Tsui and Fischer each

2 signed the false and misleading 2002 Form 10-K.  Additionally, Defendants Lotan

3 and Gonen each signed certifications which stated:

4               1. I have reviewed this Annual Report on Form 10-K of

5               MRV Communications, Inc.;

6

7               2.  Based on my knowledge, this annual report does not

                contain any untrue statement of a material fact or omit to

8

                state a material fact necessary to make the statements

9

                made, in light of the circumstances under which such

10

                statements were made, not misleading with respect to the

11

                period covered by this annual report;

12

13              3.  Based on my knowledge, the financial statements, and

14              other financial information included in this annual report,

15              fairly present in all material respects the financial

16              condition, results of operations and cash flows of the

17              registrant as of, and for, the periods presented in this

18              Annual Report;

19

20              4.  The registrant's other certifying officers and I are

                responsible for establishing and maintaining disclosure

21

                controls and procedures (as defined in Exchange Act

22

                Rules 13a-14 and 15d-14) for the registrant and we have:

23

24                 a.  designed such disclosure controls and

25              procedures to ensure that material information relating to

26              the registrant, including its consolidated subsidiaries, is

27              made known to us by others within those entities,

28

particularly during the period in which this annual report is being prepared;

b. evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c. presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a. all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

1    6.  The registrant's other certifying officers and I have

2    indicated in this annual report whether or not there were

3    significant changes in internal controls or in other factors

4    that could significantly affect internal controls

5    subsequent to the date of our most recent evaluation,

6    including any corrective actions with regard to significant

7    deficiencies and material weaknesses.

8                    *      *      *

9

10   In connection with the Annual Report of MRV

11   Communications, Inc. (the "Company") on Form 10-K

12   for the year ended December 31, 2002 as filed with the

13   Securities and Exchange Commission on the date hereof

14   (the "Report"), each of the undersigned, in the capacities

15   and on March 27, 2003, hereby certifies pursuant to 18

16   U.S.C. Section 1350, as adopted pursuant to Section 906

17   of the Sarbanes-Oxley Act of 2002, that to his

18   knowledge:

19

20   1.  The Report fully complies with the requirements of

21   Section 13(a) or 15(d) of the Securities Exchange Act of

22   1934; and

23   2.  The information contained in the Report fairly

24   presents, in all material respects, the financial condition

25   and results of operations of MRV.

26   91.    These certifications were false and misleading because Defendants

27   Lotan and Gonen each knew the 2002 Form 10-K did not properly account for

28

1  options they had backdated in 2002 and prior years, that MRV's internal controls
2  and procedures were not adequate to detect their backdating fraud, and that the
3  fraud had not been reported to the Company's auditors or its audit committee.

4  **The March 31, 2003 Form 10-Q**

5      92.    On March 31, 2003, MRV filed its quarterly report for the first quarter
6  of 2003 with the SEC on Form 10-Q.  Defendants Lotan and Gonen both signed
7  and certified the report before it was distributed to shareholders.

8      93.    In the report MRV reported a quarterly operating loss of $(6 million),
9  a quarterly net loss of $(6.4 million), and a quarterly loss per share of $(0.06).  Had
10  Defendants properly accounted for backdated options they granted in that quarter
11  and prior periods, the Company's operating loss, net loss and loss per share would
12  have been substantially and materially greater, making these statements false and
13  misleading.

14      94.    Regarding their accounting for stock-based compensation, Defendants
15  falsely stated:

16          **MRV accounts for its employee stock plan under the**
17          **intrinsic value method prescribed by Accounting**
18          **Principles Board Opinion ("APB") No. 25,**
19          **"Accounting for Stock Issued to Employees," and**
20          **related interpretations, and has adopted the**
21          **disclosure-only provisions of SFAS No. 123,**
22          **"Accounting for Stock-Based Compensation" and as**
23          **amended by SFAS No. 148, "Accounting for Stock-**
24          **Based Compensation – Transition and Disclosure, an**
25          **amendment of FASB Statement No. 123."**

26
27          SFAS No. 123, and as amended by SFAS No. 148,
28          permits companies to recognize, as expense over the

vesting period, the fair value of all stock-based awards on
the date of grant. The Black-Scholes option valuation
model was developed for use in estimating the fair value
of traded options, which have no vesting restrictions and
are fully transferable. Because MRV's stock-based
compensation plans have characteristics significantly
different from those of traded options and because
changes in the subjective input assumptions can
materially affect the fair value estimate, management
believes that the existing option valuation models do not
necessarily provide a reliable single measure of the fair
value of awards from the plan. **Therefore, as permitted,
MRV applies the existing accounting rules under APB
No. 25 and provides pro forma net loss and pro forma
loss per share disclosures for stock-based awards
made during the year as if the fair value method
defined in SFAS No. 123, as amended, had been
applied.**

(Emphasis added).

95.     Under APB 25 Defendants were required to recognize as an expense
the intrinsic value of all stock options that were "in-the-money" when actually
granted. This, Defendants have admitted, they failed to do. Thus, Defendants
statements that they accounted for options under the "intrinsic value method"
proscribed by APB 25, were false and misleading.

**The July 24, 2003 Earnings Release**

96.     On July 24, 2003, the Company issued a press release entitled, "MRV
Reports Second Quarter 2003 Financial Results." The press release stated in part:

1   MRV COMMUNICATIONS, INC. (Nasdaq: MRVC), a
2   leading provider of optical components and unlimited
3   connectivity solutions for scalable networks, today
4   reported its financial results for the second quarter ended
5   June 30, 2003.

6   **Net loss for the second quarter of 2003 was $9.8**
7   **million, or $0.10 per share, compared to a net loss of**
8   **$6.4 million, or $0.06 per share for the prior quarter,**
9   **and a net loss of $18.8 million, or $0.21 per share, for**
10  **the second quarter of 2002.** Revenues for the second
11  quarter of 2003 were $62.0 million compared to $51.1
12  million for the prior quarter, and $61.6 million for the
13  second quarter last year.

14

15  **Outlook**

16  **The Company expects improvement in its net loss per**
17  **share for the third quarter to be in the range of $0.07**
18  **to $0.09 per share based on revenue expectations**
19  **within the range of $54 million to $59 million.** The
20  third quarter is a summer quarter in Europe, where most
21  of the Company's revenues are concentrated. The
22  Company expects seasonally stronger results for the
23  fourth quarter.
24

25  "We executed well this quarter. Our Balance Sheet
26  continues to improve. **We have exceeded expectations**
27  **both on top and bottom line performance, and are**
28  **very pleased with our continued improvements at**

**MRV. Continuation of these trends will transition the Company towards break-even and profitability in 2004,"** said Noam Lotan, MRV's president and CEO.

(Emphasis added).

97.     These statements were false and misleading because Defendants improper accounting for backdated stock options intentionally hid compensation expenses and substantially and materially inflated the Company's reported income and earnings.  Moreover, the Company's outlook was based on a continuation of the same improper accounting treatment for backdated options and was thus also materially false and misleading.

**The August 13, 2003 Form 10-Q**

98.     On August 13, 2003, MRV filed its quarterly report for the second quarter of 2003 with the SEC on Form 10-Q.  Defendants Lotan and Gonen both signed and certified the report before it was distributed to shareholders.

99.     In the report MRV reported a quarterly operating loss of $(3.8 million), a quarterly net loss of $(9.8million), and a quarterly loss per share of $(0.10).  Had Defendants properly accounted for backdated options they granted in that quarter and prior periods, the Company's operating loss, net loss and loss per share would have been substantially and materially greater, making these statements false and misleading.

100.   Regarding their accounting for stock-based compensation, Defendants made the same statements they made in MRV's quarterly report for the first quarter of 2003, filed with the SEC on March 31, 2003, and those statements were false and misleading for the same reasons set forth above in paragraphs 93-94.

**The October 22, 2003 Earnings Release**

101.   On October 22, 2003, the Company issued a press release entitled, "MRV Reports Third Quarter 2003 Financial Results." The press release stated in part:

> MRV COMMUNICATIONS, INC. (Nasdaq: MRVC) today reported its financial results for the third quarter ended September 30, 2003. **Net loss for the third quarter of 2003 was $5.9 million, or $0.06 per share, compared to a net loss of $9.8 million, or $0.10 per share for the prior quarter, and a net loss of $117.1 million, or $1.24 per share, for the third quarter of 2002.** Revenues for the third quarter of 2003 were $56.8 million compared to $62.0 million for the prior quarter, and $60.8 million for the third quarter last year.
>
> **Outlook**
>
> For the fourth quarter, the Company expects mid to high single digit percentage improvement in both its top and bottom line.

(Emphasis added).

102.   These statements were false and misleading because Defendants improper accounting for backdated stock options intentionally hid compensation expenses and substantially and materially inflated the Company's reported income and earnings.  Moreover, the Company's outlook was based on a continuation of the same improper accounting treatment for backdated options and was thus also materially false and misleading.

**The 2002 Proxy Statement**

103.   On or about November 12, 2003, the Company filed its definitive Proxy Statement for 2002 with the SEC. The 2002 Proxy Statement was also simultaneously distributed to shareholders and the public.  This Proxy Statement was solicited by, and on behalf of, MRV's Board of Directors, including Defendants Lotan, Shidlovsky, Jaensch, Tsui and Fisher.  The primary purpose of the Proxy Statement was to solicit votes for the re-election of these Defendants to MRV's Board of Directors at the annual shareholders meeting. The 2002 Proxy Statement falsely stated, **"MRV has various stock option and warrant plans that provide for granting options and warrants to purchase shares of MRV's common stock to employees, directors and non-employees performing consulting or advisory services for MRV. ... Under these plans, stocks option and warrant exercise prices generally equal the fair market value of MRV's common stock at the date of grant."** (Emphasis added).

104.   These statements were false and misleading because at the time they were made Defendants had been systematically granting in-the-money backdated stock options for approximately 7 years and had been manipulating the accounting for those options to hide the compensation expenses their backdating had created. Had the proxy statement not affirmatively covered-up their fraud, shareholders would certainly have voted against the re-election of Defendants Lotan, Shidlovsky, Jaensch, Tsui and Fisher.  The false statements in the 2002 Proxy Statement were thus an essential link in the accomplishment and continuation of Defendants' backdating scheme.

**The November 14, 2003 Form 10-Q**

105.   On November 14, 2003, MRV filed its quarterly report for the third quarter of 2003 with the SEC on Form 10-Q.  Defendants Lotan and Gonen both signed and certified the report before it was distributed to shareholders.

106.   In the report MRV reported a quarterly operating loss of $(6.9 million), a quarterly net loss of $(5.9 million), and a quarterly loss per share of $(0.08).  Had Defendants properly accounted for backdated options they granted in that quarter and prior periods, the Company's operating loss, net loss and loss per share would have been substantially and materially greater, making these statements false and misleading.

107.   Regarding their accounting for stock-based compensation, Defendants made the same statements they made in MRV's quarterly report for the first quarter of 2003, filed with the SEC on March 31, 2003, and those statements were false and misleading for the same reasons set forth above in paragraphs 93-94.

**The February 5, 2004 Earnings Release**

108.   On February 5, 2004, the Company issued a press release entitled, "MRV Reports Fourth Quarter and Year End 2003 Financial Results." The press release stated in part:

> **Net loss for the fourth quarter of fiscal 2003 was $4.9 million, or $0.05 per share, compared to a net loss of $17.4 million, or $0.18 per share, for the fourth quarter of 2002 and a net loss of $5.9 million, or $0.06 per share, for the third quarter of 2003.** Revenues for the fourth quarter of fiscal 2003 were $72.0 million compared to $67.7 million for the fourth quarter of last year, and $56.8 million for the third quarter 2003.
>
> **Net loss for fiscal 2003 was $27.0 million, or $0.26 per share, compared with a net loss of $479.8 million, or $5.25 per share, for the year ended December 31, 2002.** Revenues for the year ended December 31, 2003 were $241.8 million, compared with $252.5 million for

the year ended December 31, 2002. Revenues for the year ended December 31, 2002 included $17 million from the company's divested passive component division.

Noam Lotan, MRV's president and CEO, commented, "Q4 was a strong quarter for MRV and our industry. Overall revenues grew 27% sequentially. We grew in North America, with revenues up 21%, and enjoyed seasonal strength in Europe, with revenues up 30%. **Our operating loss was cut in half from the previous quarter, and the bottom line continues to improve.** We are encouraged with the current business climate and the near term growth prospects for MRV. As metro Ethernet continues to gain acceptance, MRV sees more potential for growth. MRV is at the leading edge of implementing the new industry standards for Ethernet service delivery and the emergence of these Services represents an excellent opportunity for us."

(Emphasis added).

109.   These statements were false and misleading because Defendants improper accounting for backdated stock options intentionally hid compensation expenses and substantially and materially inflated the Company's reported income and earnings.  Additionally, unrecognized expenses from Defendants' backdating scheme meant MRV did not cut its operating loss in half from the previous quarter, rendering Defendant Lotan's statement to that effect false and misleading.

**The 2003 Form 10-K**

110.   On or about March 4, 2004, the Company filed its fiscal 2003 Form 10-K with the SEC. The 2003 Form 10-K was also simultaneously distributed to shareholders and the public.

111.   The 2003 Form 10-K falsely reported an annual operating loss of $(20.1 million), an annual net loss of $(27 million), and an annual loss per share of $(0.26).   Had Defendants properly accounted for backdated options they granted in 2003 and prior periods, the Company's operating loss, net loss and loss per share would have been substantially and materially greater, making these statements false and misleading.

112.   Regarding the Company's (1) accounting for stock-based compensation (2) description of its stock option plans, and (3) assessment of the adequacy of its internal controls, Defendants made the same statements they made in MRV's 2002 Form 10-K, filed with the SEC on March 28, 2003.  Each of those statements were false and misleading for the same reasons set forth above in paragraphs 80-84 and 87-90.

113.   Defendants also falsely stated there was no deferred stock expense generated in 2003, but, as MRV later admitted, the Company's internal investigation determined options were backdated in 2003.  Thus, deferred compensation expense was created in 2003, but was not taken.

114.   Defendants Lotan, Gonen, Shidlovsky, Jaensch, Tsui and Fischer each signed the false and misleading 2003 Form 10-K.

115.   Additionally, Defendants Lotan and Gonen each signed the same certifications they did for the 2002 Form 10-K.  *See* ¶¶ 89-90.  These certifications were false and misleading because Defendants Lotan and Gonen each knew the 2003 Form 10-K did not properly account for options they had backdated in 2003 and prior periods, that MRV's internal controls and procedures were not adequate

1  to detect their backdating fraud, and that the fraud had not been reported to the
2  Company's auditors or its audit committee.
3  **The April 22, 2004 Earnings Release**
4       116.  On April 22, 2004, the Company issued a press release entitled,
5  "MRV Reports First Quarter 2004 Financial Results." The press release stated in
6  part:

7              **Net loss for the first quarter of 2004 was $4.8 million,**
8              **or $0.05 per share, compared to a net loss of $6.4**
9              **million, or $0.06 per share, for the first quarter of**
10             **2003 and a net loss of $4.9 million, or $0.05 per share,**
11             **for the fourth quarter of 2003.** Revenues for the first
12             quarter of 2004 were $59.6 million compared to $51.1
13             million for the first quarter of 2003, and $69.1 million for
14             the fourth quarter of 2003.

15  (Emphasis added).
16       117.  These statements were false and misleading because Defendants
17  improper accounting for backdated stock options intentionally hid compensation
18  expenses and substantially and materially inflated the Company's reported income
19  and earnings.
20  **The April 30, 2004 Form 10-Q**
21       118.  On April 30, 2004, MRV filed its quarterly report for the first quarter
22  of 2004 with the SEC on Form 10-Q.  Defendants Lotan and Gonen both signed
23  and certified the report before it was distributed to shareholders.
24       119.  In the report MRV reported a quarterly operating loss of $(4.1
25  million), a quarterly net loss of $(4.8 million), and a quarterly loss per share of
26  $(0.05).  Had Defendants properly accounted for backdated options they granted in
27  that quarter and prior periods, the Company's operating loss, net loss and loss per
28

1  share would have been substantially and materially greater, making these

2  statements false and misleading.

3      120.   Regarding their accounting for stock-based compensation, Defendants

4  made the same statements they made in MRV's quarterly report for the first quarter

5  of 2003, filed with the SEC on March 31, 2003, and those statements were false

6  and misleading for the same reasons set forth above in paragraphs 93-94.

7  **The July 22, 2004 Earnings Release**

8      121.   On July 22, 2004, the Company issued a press release entitled, "MRV

9  Reports Second Quarter 2004 Financial Results."  The press release stated in part:

10     **Net loss for the second quarter of 2004 was narrowed**

11     **to $3.1 million, or $0.03 per share, compared to a net**

12     **loss of $9.8 million, or $0.10 per share, for the second**

13     **quarter of 2003 and a net loss of $4.8 million, or $0.05**

14     **per share, for the first quarter of 2004.**

15         *     *     *

16

17     Noam Lotan, MRV's president and CEO, commented,

18     **"Q2 was a very good quarter…Our net loss per share**

19     **was reduced to $0.03 per share.** Overall revenues grew

20     9% for the second quarter of 2004 compared to the same

21     quarter last year, and were at the high end of our

22     guidance. We have been growing on a year-over-year

23     basis for three consecutive quarters. Our outlook

24     continues to be positive for the next quarter and beyond.

25     We expect year-over-year growth for the third quarter

26     within the range of $60 to $64 million, lower than the

27     second quarter due to the seasonal effects in Europe,

28     which accounts for approximately 70% of our revenues."

FIRST AMENDED CLASS ACTION COMPLAINT

1  (Emphasis added).

2      122.   These statements were false and misleading because Defendants

3  improper accounting for backdated stock options intentionally hid compensation

4  expenses and substantially and materially inflated the Company's reported income

5  and earnings.

6  **The July 30, 2004 Form 10-Q**

7      123.   On July 30, 2004, MRV filed its quarterly report for the second

8  quarter of 2004 with the SEC on Form 10-Q.  Defendants Lotan and Gonen both

9  signed and certified the report before it was distributed to shareholders.

10      124.   In the report MRV reported a quarterly operating loss of $(919

11  thousand), a quarterly net loss of $(3.1 million), and a quarterly loss per share of

12  $(0.03).  Had Defendants properly accounted for backdated options they granted in

13  that quarter and prior periods, the Company's operating loss, net loss and loss per

14  share would have been substantially and materially greater, making these

15  statements false and misleading.

16      125.   Regarding their accounting for stock-based compensation, Defendants

17  made the same statements they made in MRV's quarterly report for the first quarter

18  of 2003, filed with the SEC on March 31, 2003, and those statements were false

19  and misleading for the same reasons set forth above in paragraphs 93-94.

20  **The October 21, 2004 Earnings Release**

21      126.   On October 21, 2004, the Company issued a press release entitled,

22  "MRV Reports Third Quarter 2004 Financial Results - Ramp-up in FTTP Results

23  in 44% Sequential Increase in Optical Component Revenues."  The press release

24  stated in part:

25          **Net loss for the third quarter of 2004 was $3.8 million,**

26          **or $0.04 per share, compared to a net loss of $5.9**

27          **million, or $0.06 per share, for the third quarter of**

28

FIRST AMENDED CLASS ACTION COMPLAINT

51

**2003 and a net loss of $3.1 million, or $0.03 per share,**
**for the second quarter of 2004.**

(Emphasis added).

127.   These statements were false and misleading because Defendants improper accounting for backdated stock options intentionally hid compensation expenses and substantially and materially inflated the Company's reported income and earnings.

**The October 28, 2004 Form 10-Q**

128.   On October 28, 2004, MRV filed its quarterly report for the third quarter of 2004 with the SEC on Form 10-Q.  Defendants Lotan and Gonen both signed and certified the report before it was distributed to shareholders.

129.   In the report MRV reported a quarterly operating loss of $(3.1 million), a quarterly net loss of $(3.8 million), and a quarterly loss per share of $(0.04).  Had Defendants properly accounted for backdated options they granted in that quarter and prior periods, the Company's operating loss, net loss and loss per share would have been substantially and materially greater, making these statements false and misleading.

130.   Regarding their accounting for stock-based compensation, Defendants made the same statements they made in MRV's quarterly report for the first quarter of 2003, filed with the SEC on March 31, 2003, and those statements were false and misleading for the same reasons set forth above in paragraphs 93-94.

**The 2003 Proxy Statement**

131.   On or about November 12, 2004, the Company filed its definitive Proxy Statement for 2003 with the SEC. The 2003 Proxy Statement was also simultaneously distributed to shareholders and the public.  This Proxy Statement was solicited by, and on behalf of, MRV's Board of Directors, including Defendants Lotan, Shidlovsky, Jaensch, Tsui and Fisher.  The primary purpose of

the Proxy Statement was to solicit votes for the re-election of these Defendants to MRV's Board of Directors at the annual shareholders meeting.

The 2003 Proxy Statement falsely stated, **"MRV has various stock option and warrant plans that provide for granting options and warrants to purchase shares of MRV's common stock to employees, directors and non-employees performing consulting or advisory services for MRV. ... Under these plans, stocks option and warrant exercise prices generally equal the fair market value of MRV's common stock at the date of grant."** (Emphasis added).

132.   These statements were false and misleading because at the time they were made Defendants had been systematically granting in-the-money backdated stock options for approximately 8 years and had been manipulating the accounting for those options to hide the compensation expenses their backdating had created. Had the proxy statement not affirmatively covered-up their fraud, shareholders would certainly have voted against the re-election of Defendants Lotan, Shidlovsky, Jaensch, Tsui and Fisher.  The false statements in the 2003 Proxy Statement were thus an essential link in the accomplishment and continuation of Defendants' backdating scheme.

**The February 10, 2005 Earnings Release**

133.   On February 10, 2005, the Company issued a press release entitled, "MRV Reports Fourth Quarter and Full Year 2004 Financial Results - Fourth Quarter Revenue Increased 18% Year-Over-Year and 30% Sequentially."  The press release stated in part:

> **Net income for the fourth quarter of 2004 was $918,000, or $0.01 per share, compared to a net loss of $4.9 million, or $0.05 per share, for the fourth quarter of 2003 and a net loss of $3.8 million, or $0.04 per share, for the third quarter of 2004.** Revenue for the fourth quarter of 2004 was $81.9 million compared to

$69.1 million for the fourth quarter of 2003, and $62.9 million for the third quarter of 2004.

**Net loss for the year ended 2004 was $10.7 million, or $0.10 per share, compared with a net loss of $27.0 million, or $0.26 per share, for the year ended 2003.** Revenue for the year ended 2004 was $271.7 million, a 14% increase compared with $239.0 million for the year ended 2003.

\*        \*        \*

**Management Expectations**

The Company expects continued improvements in both the top line and the bottom line for 2005.

(Emphasis added).

134.   These statements were false and misleading because Defendants improper accounting for backdated stock options intentionally hid compensation expenses and substantially and materially inflated the Company's reported income and earnings.  Moreover, the Company's outlook was based on a continuation of the same improper accounting treatment for backdated options and was thus also materially false and misleading.

**The 2004 Form 10-K**

135.   On or about March 8, 2005, the Company filed its fiscal 2004 Form 10-K with the SEC. The 2004 Form 10-K was also simultaneously distributed to shareholders and the public.

136.   The 2004 Form 10-K falsely reported an annual operating loss of $(7.2 million), an annual net loss of $(10.7 million), and an annual loss per share of

1  $(0.10). Had Defendants properly accounted for backdated options they granted in
2  2004 and prior periods, the Company's operating loss, net loss and loss per share
3  would have been substantially and materially greater, making these statements
4  false and misleading.

5      137.  Regarding the Company's (1) accounting for stock-based
6  compensation and (2) description of its stock option plans, Defendants made the
7  same statements they made in MRV's 2002 Form 10-K, filed with the SEC on
8  March 28, 2003.  Each of those statements were false and misleading for the same
9  reasons set forth above in paragraphs 80-81 and 83-84.

10      138.  Defendants also falsely stated there was no deferred stock expense
11  generated in 2004, but, as MRV later admitted, the Company's internal
12  investigation determined options were backdated in 2004.  Thus, deferred
13  compensation expense was created in 2004, but was not taken.

14      139.  The 2004 Form 10-K also included the following false and misleading
15  assessment of MRV's internal controls:

16          We maintain disclosure controls and procedures that are
17          designed to ensure that information required to be
18          disclosed in our Exchange Act reports is recorded,
19          processed, summarized and reported within the timelines
20          specified in the Securities and Exchange Commission's
21          rules and forms, and that such information is
22          accumulated and communicated to our management,
23          including our Chief Executive Officer and Chief
24          Financial Officer, as appropriate, to allow timely
25          decisions regarding required disclosure. In designing and
26          evaluating the disclosure controls and procedures,
27          management recognized that any controls and
28          procedures, no matter how well designed and operated,

FIRST AMENDED CLASS ACTION COMPLAINT

can only provide reasonable assurance of achieving the desired control objectives, and in reaching a reasonable level of assurance, management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by SEC Rule 13a-15(b), the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and the Company's Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures as of the end of the year covered by this Report. Based on the foregoing, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level.

**Management's Report on Internal Control Over Financial Reporting**

Internal control over financial reporting refers to the process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, and effected by our Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally

accepted in the United States, and includes those policies
and procedures that:

-   Pertain to the maintenance of records that in
    reasonable detail accurately and fairly reflect the
    transactions and dispositions of our assets;

-   Provide reasonable assurance that transactions are
    recorded as necessary to permit preparation of
    financial statements in accordance with accounting
    principles generally accepted in the United States,
    and that our receipts and expenditures are being
    made only in accordance with authorization of our
    management and directors; and

-   Provide reasonable assurance regarding prevention
    or timely detection of unauthorized acquisition,
    use or disposition of our assets that could have a
    material effect on the financial statements.

*        *        *

Management has used the framework set forth in the
report entitled *Internal Control – Integrated Framework*
published by the Committee of Sponsoring Organizations
of the Treadway Commission, known as COSO, to
evaluate the effectiveness of the Company's internal
control over financial reporting. Management has
concluded that our internal control over financial
reporting was effective as of December 31, 2004. Ernst &

Young LLP, our independent registered public
accounting firm, has issued an attestation report on
management's assessment of our internal control over
financial reporting, which is included below.

140.   Defendants, however, knew these statements were false and misleading, because they knew the Company lacked internal controls or procedures to detect their backdating scheme, or to uncover the enhanced income and earnings that the scheme produced on MRV's financial statements.

141.   Defendants Lotan, Gonen, Shidlovsky, Jaensch, Tsui and Fischer each signed the false and misleading Form 10-K.

142.   Additionally, Defendants Lotan and Gonen each signed the same certifications they did for the 2002 Form 10-K. *See* ¶ 89-90.  These certifications were false and misleading because Defendants Lotan and Gonen each knew the 2004 Form 10-K did not properly account for options they had backdated in prior periods, that MRV's internal controls and procedures were not adequate to detect their backdating fraud, and that the fraud had not been reported to the Company's auditors or its audit committee.

**The April 27, 2005 Earnings Release**

143.   On April 27, 2005, the Company issued a press release entitled, "MRV Announces First Quarter 2005 Financial Results - First Quarter Revenue Increased 4% Year-Over-Year." The press release stated in part:

> **Net loss for the first quarter of 2005 was $6.4 million,
> or $0.06 per share, compared to a net loss of $4.8
> million, or $0.05 per share, for the first quarter of
> 2004 and net income of $918,000, or $0.01 per share,
> for the fourth quarter of 2004.**

(Emphasis added).

1    144.   These statements were false and misleading because Defendants

2  improper accounting for backdated stock options intentionally hid compensation

3  expenses and substantially and materially inflated the Company's reported income

4  and earnings.

5  **The May 10, 2005 Form 10-Q**

6    145.   On May 10, 2005, MRV filed its quarterly report for the first quarter

7  of 2005 with the SEC on Form 10-Q.  Defendants Lotan and Gonen both signed

8  and certified the report before it was distributed to shareholders.

9    146.   In the report MRV reported a quarterly operating loss of $(3.8

10  million), a quarterly net loss of $(6.4 million), and a quarterly loss per share of

11  $(0.06).  Had Defendants properly accounted for backdated options they granted in

12  that quarter and prior periods, the Company's operating loss, net loss and loss per

13  share would have been substantially and materially greater, making these

14  statements false and misleading.

15    147.   Regarding their accounting for stock-based compensation, Defendants

16  made the same statements they made in MRV's quarterly report for the first quarter

17  of 2003, filed with the SEC on March 31, 2003, and those statements were false

18  and misleading for the same reasons set forth above in paragraphs 93-94.

19  **The July 27, 2005 Earnings Release**

20    148.   On July 27, 2005, the Company issued a press release entitled, "MRV

21  Communications Reports Second Quarter of 2005 Financial Results - FTTP

22  Business Resumes Growth in the Third Quarter; Second Quarter Revenues

23  Increase 4% Sequentially." The press release stated in part:

24          **Net loss for the second quarter of 2005 was $4.1**

25          **million, or $0.04 per share, a reduction of 35% when**

26          **compared to a net loss of $6.4 million, or $0.06 per**

27          **share, for the first quarter of 2005.  Net loss for the**

28          **second quarter of 2004 was $3.1 million, or $0.03 per**

**share.  Net loss for the first half of 2005 was $10.6**
**million, or $0.10 per share, compared to a net loss of**
**$7.8 million, or $0.07 per share, for the first half of**
**2004.**

       \*       \*       \*

**Net loss per share [for the third quarter] is forecasted**
**to be in the range of $0.04 to $0.05 per share.**

(Emphasis added).

149.  These statements were false and misleading because Defendants improper accounting for backdated stock options intentionally hid compensation expenses and substantially and materially inflated the Company's reported income and earnings.  Moreover, the Company's outlook was based on a continuation of the same improper accounting treatment for backdated options and was thus also materially false and misleading.

**The July 29, 2005 Form 10-Q**

150.  On July 29, 2005, MRV filed its quarterly report for the second quarter of 2005 with the SEC on Form 10-Q.  Defendants Lotan and Gonen both signed and certified the report before it was distributed to shareholders.

151.  In the report MRV reported a quarterly operating loss of $(2.2 million), a quarterly net loss of $(4.1 million), and a quarterly loss per share of $(0.04).  Had Defendants properly accounted for backdated options they granted in that quarter and prior periods, the Company's operating loss, net loss and loss per share would have been substantially and materially greater, making these statements false and misleading.

152.  Regarding their accounting for stock-based compensation, Defendants made the same statements they made in MRV's quarterly report for the first quarter